UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF TENNESSEE
at GREENEVILLE

ROBERT ALLEN CRAWFORD,                    )
                                          )
            Petitioner,                   )
                                          )
v.                                        )          No. 2:11-CV-50
                                          )          *Greer/Inman*
TONY PARKER, Warden,                      )
                                          )
            Respondent.                   )

## MEMORANDUM OPINION

In 2002, Robert Allen Crawford ("Petitioner" or "Crawford") was convicted of first degree

felony murder, criminally negligent homicide, aggravated burglary, aggravated assault and reckless

endangerment by a jury in the Criminal Court for Washington County, Tennessee. For these

offenses, petitioner was sentenced to a life term of imprisonment with the possibility of parole, [Doc.

10, Addendum 1A, Judgment at 136] . Petitioner now brings this *pro se* application for a writ of

habeas corpus under 28 U.S.C. § 2254, challenging the legality of his confinement under that

judgment of conviction, [Doc. 2].

Respondent Tony Parker, Warden of the Northwest Correctional Complex and petitioner's

custodian, has filed an answer, [Doc. 9], along with the state court record, including the state-court

opinions on direct and post-conviction review, the transcript of the trial and the post-conviction

hearing, and the technical records, [Doc. 10, Addenda 1-4]. Respondent argues, in his answer, that

Crawford is not entitled to relief under the deferential standard of review contained in the

Antiterrorism and Death Penalty Act of 1996 ("AEDPA"), while also arguing that one claim has

been procedurally defaulted. Petitioner has filed a reply, [Doc. 13], opposing the Warden's position,

and respondent has filed a surreply, [Doc. 16]. In addition, Crawford has filed a reply to respondent's surreply, [Doc. 22]. The Court agrees with respondent that petitioner is not entitled to relief and accordingly will dismiss his petition.

## I. Procedural History

Following petitioner's trial, he unsuccessfully moved for a new trial, [Doc. 10, Addendum 1B, Mot. for a New T. at 142-53; Amd. Mot. for a New T. at 159-60]. Petitioner filed a direct appeal, which was denied by the Tennessee Court of Criminal Appeals (TCCA), [1] and thereafter, by the Tennessee Supreme Court. *State v. Crawford*, No. E2003-00627-CCA-R3-CD, 2004 WL 442906 (Tenn. Crim. App. Mar. 9, 2004), *perm. app. denied*, (Tenn. 2004). Petitioner next sought post-conviction relief in the trial court. After an evidentiary hearing, the trial court dismissed the post-conviction case, the dismissal was affirmed on appeal, and the Tennessee Supreme Court declined further review. *Crawford v. State*, No. E2009-01441-CCA-R3-PC, 2010 WL 3561933 (Tenn. Crim. App. Sept. 14, 2010), *perm. app. denied*, (Tenn. 2011). Crawford then submitted this instant federal habeas corpus application.

## II. Factual Background

The facts are drawn from the TCCA's opinion issued during petitioner's direct appeal. According to testimony at the trial, in the early morning hours of June 22, 1999, Crawford, who recently had been charged with domestic violence in connection with an assault on his girlfriend, Diane Hatley, went to a mobile home in Jonesborough, Tennessee. Residing in the mobile home were Hatley's father, William Ricker, his longtime companion, Linda Leopold, and their mentally

---

[1] Crawford's first notice of appeal was filed simultaneously with his motion for a new trial. Because of the pendency of the motion for a new trial, that appeal was dismissed, [Doc. 10, Addendum 1B, Order of the TCCA at 164].

2

and physically disabled daughter, Georgia Ricker. Petitioner pushed his way into Hatley's bedroom and Ricker ordered petitioner to leave. Petitioner complied.

That afternoon, at approximately 1:15 p.m., while Ricker and Hatley were in court on the domestic abuse charge she had filed against petitioner, Crawford, who himself was scheduled to be in court, returned to the mobile home and entered through an unlocked sliding back door. Petitioner inquired of Leopold, who had come out of the bathroom, about Hatley's whereabouts and she replied that Hatley and her father had gone to court to obtain paperwork to have petitioner leave Hatley alone because she was afraid of him. Petitioner became angry when Leopold him that, rather than to allow him to come in to return Hatley's clothes, as he had repeatedly requested, he could leave them on the front porch. Leopold asked him to leave and, as Crawford backed out on the porch, he pulled a red shotgun shell out of his pocket and retorted, "Well, I got this for her. If I can't have her, nobody else can." (Hatley had recently ended her rancorous relationship with petitioner.)

Some fifteen minutes later, Hatley and Ricker returned to the trailer to find that the phone lines had been cut. A police officer, who was summoned to the Ricker residence from a neighbor's telephone, stayed about twenty minutes discussing the incident and inspecting the cut phone lines. Shortly after the family went back into the mobile home, Hatley called to her father that Crawford was coming on the porch with a shotgun. Hatley took Georgia Ricker into a bedroom and Leopold joined Ricker on the front porch. Petitioner pointed the shotgun at Leopold and Ricker and told them he was going to shoot. Ricker yelled at petitioner to put his gun down, but when petitioner kept advancing, they retreated inside. Leopold shut the door, locked it, and attempted to hold it shut. Leopold heard the bottom of the door being banged, saw the door popping open, and shouted to

Ricker that she was unable to hold the door. As Ricker came behind her and reached to hold the door, the first shot went through the doorknob and burned her hand. Ricker pushed her aside, screamed at petitioner to put the gun down, while at the same time she yelled at petitioner not to shoot. When the second shot struck Ricker, he turned to Leopold and said, "Linda, he shot me," and fell into her arms. Leopold laid Ricker down in the hallway and went into the bathroom.

Ricker's body blocked the front door and prevented Crawford from entering, so he broke a window, reamed out the broken glass with his shotgun, stepped through the window, and began destroying everything in the front room. When Crawford saw Hatley in the kitchen, he raised his gun and approached her and she advanced to meet him. As they battled for possession of the shotgun, petitioner beat Hatley. During the altercation, Crawford told Hatley that she had made him kill her father and that he intended to make her watch him kill Leopold and Georgia Ricker before he killed her. Leopold fled through the front door when Crawford was distracted by Hatley's pleas for him to leave.

The officer who had responded to the call concerning Ricker's cut phone lines also responded to the report of a shooting. When the officer arrived, he saw broken glass, a hole in the front door, but no people, so he called out to Leopold on his loudspeaker. In response, Leopold ran out from her hiding place and the officer directed her to go to a neighbor's house. Another officer arrived and both were approaching the home, when Hatley exited through the front door carrying a shotgun. Hatley was instructed to put down the weapon (which was loaded, cocked, and ready to fire) and also to go to the neighbor's house. Carpenter came out on the porch, stopped when he saw the officers, but, ignoring their orders to get down on his knees with his hands raised, went back inside the trailer, then outside through a screen door, leapt over the porch railing, and fled through

4

a field and barbed wire fence. Ultimately, another officer chased Crawford and captured him. Petitioner was unarmed, though he had a 16-gage shotgun shell in his front pocket and an odor of alcohol about him.

Another neighbor, who had seen a black pickup truck parked after the shooting at a vacant house close to the trailer, discovered an empty bottle of Jack Daniels whiskey, cigarette butts, and a cigarette lighter in a flattened area, next to the fence row, where it appeared that someone had been sitting. (Petitioner had a black pick up truck.) Cinder blocks had been stacked to make steps across a barbed wire fence across from the vacant house. The neighbor pointed out his discoveries to one of the officers.

Crawford gave two statements following his arrest. The first one was terminated by the officers who feared that he was intoxicated. The second statement was taken the next day and was read to the jury. In that statement, Crawford said that Hatley had picked up the shotgun, loaded a shell, and fired and that Ricker "went down," but also said that he "didn't mean to shoot" Ricker and that he had taken the shotgun to the Ricker's "not to hurt anyone but to hurt [himself]." At trial, petitioner testified that he had no memory of going to the house and talking to Leopold, cutting the telephone wires, walking onto the porch of the trailer and confronting Ricker and Leopold with the shotgun, having shot the door (though it was possible that he had), Ricker screaming at him to put down the gun (perhaps, due to a hearing problem), or breaking the window with the shotgun, and that the only thing he remembered while inside the trailer was sitting at the kitchen table talking with Hatley. He reiterated that he had no intention of killing anyone.

### III. Discussion

5

In his § 2254 form application, Crawford claims that: (1) there was insufficient evidence to support the first degree felony murder conviction, (2) Count 3 of the indictment was fatally defective, (3) he received ineffective assistance due to counsel's failure to request a jury instruction on voluntary intoxication and (4) counsel was ineffective in failing to develop a mental health defense, [Doc. 2]. In his supporting memorandum brief, petitioner asserts two additional instances of ineffective assistance, to wit, that counsel failed to interact with co-counsel with respect to petitioner's defense of voluntary intoxication and to obtain a hearing device for petitioner, [Doc. 3].

According to the Warden, all grounds, save Ground 3, were adjudicated by the state courts, but Ground 3 was not raised in those courts. The Warden asserts that petitioner has committed a procedural default of Ground 3, since petitioner did not present the claim to the state courts for disposition when he had the opportunity and since he cannot do so now due to the expiration of Tennessee's post-conviction statute of limitations. Petitioner argues that all claims have merit, that he can show cause for the procedural default of Ground 3, and that writ of habeas corpus should issue on his behalf. The Court addresses first the grounds raised in the § 2254 application and then turns to the grounds offered in petitioner's brief.

## A. Standard of Review

The ADEPA limits a federal court's review of issues previously adjudicated and also provides that a federal court should presume a state court's findings of fact to be correct, unless they are based on an unreasonable determination of the facts in light of the evidence presented in the state court proceedings. 28 U.S.C. § 2254(d)(2). It is a petitioner's burden to rebut the presumption by clear and convincing evidence. 28 U.S.C. § 2254(e)(1). Moreover, a petitioner cannot be granted habeas relief on any claim litigated in the state courts, unless the resulting decision "was contrary

to, or involved an unreasonable application of, clearly established Federal law." 28 U.S.C. § 2254(d)(1).

A state court's decision is "contrary to" federal law when it arrives at a conclusion opposite to that reached by the Supreme Court on a question of law or resolves a case differently on a set of facts which cannot be distinguished materially from those upon which the precedent was decided. *Williams v. Taylor*, 529 U.S. 362, 413 (2000). Under the "unreasonable application" prong of § 2254(d)(1), the relevant inquiry is whether the state court decision identifies the legal rule in Supreme Court cases which governs the issue but unreasonably applies that principle to the particular facts of the case. *Id.* at 407. The habeas court is to determine only whether the state court's decision is objectively reasonable, not whether, in the habeas court's view, it is incorrect or wrong. *Id.* at 411.

The "highly deferential standard" dictated in § 2254(d) mandates that state courts' decisions "be given the benefit of the doubt." *Bell v. Cone,* 543 U.S. 447, 455 (2005) (citations omitted).

## B. The Claims

### 1. Insufficient Evidence (Felony Murder)

Crawford asserts, in his first claim, that the evidence was not sufficient to support his conviction for felony murder because the jury was required to presume both "intent" and "victim," thus impermissibly shifting the burden of proof to him. As to the "intent" aspect of this claim, Crawford cites to *Sandstrom v. Montana*, 442 U.S. 510 (1979), for its holding that "[i]ntent cannot be presumed, because such a presumption would impermissibly shift the burden of proof to the defendant," reasoning that the failure to include "any 'victim' that the petitioner 'intended to assault' forces the jury to presume a victim and intent.

According to Crawford, he was charged with committing felony murder in the perpetration of an aggravated burglary but, in the count which charged him with aggravated burglary, the indictment merely alleged that he had committed the offense by entering a habitation, "the property of Billy Ricker, without effective consent of the owner(s) and with intent to commit an assault."

Crawford maintains that "the State cannot simply allege an assault as the basis for an underlying felony in a felony murder charge without alleging, and proving beyond a reasonable doubt, who the intended victim might be," [Doc. 3, Pet'r's Br. at 9].[2] Petitioner's argument (by inference) is that the name of the intended victim was an element of the predicate felony of aggravated burglary, that the underlying felony had to be proven before a determination of guilt of felony murder could be made, and that, because there was not proof beyond a reasonable doubt of every fact necessary (to wit, the identity of the intended victim) to constitute the felony murder offense with which he was charged, the evidence was insufficient to sustain his conviction.

The standard which controls an insufficient evidence claim is found in *Jackson v. Virginia*, 443 U.S. 307, 324 (1979). There, the Supreme Court held that sufficient evidence supports a conviction if, after viewing the evidence and the inferences to be drawn therefrom in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *Id.* at 324; *also Gall v. Parker*, 231 F.3rd 265, 287-88 (6th Cir. 2000) (noting that *Jackson* is the governing precedent for claims of insufficient evidence). It is the responsibility of the trier of fact to resolve conflicts in testimony, to weigh the evidence, and to draw reasonable inferences from the facts. *Herrera v. Collins*, 506 U.S. 390, 401-02 (1993). Petitioner "bears a heavy burden" when insufficiency of the evidence is claimed. *United States v. Vannerson*,

---

[2]     The page number references in citations to court documents corresponds with the pagination in the Court's electronic case filing system ("ECF").

786 F.2d 221, 225 (6th Cir. 1986). A habeas court must apply two levels of deference when insufficient evidence is claimed. *Parker v. Renico*, 506 F.3d 444, 448 (6th Cir. 2007). Under *Jackson*, deference is owed to the factfinder's verdict, "with explicit reference to the substantive elements of the criminal offense as defined by state law." *Tucker v. Palmer*, 541 F.3d 652, 656 (6th Cir. 2008) (quoting *Jackson*, 443 U.S. at 324 n.16). Under AEDPA, deference is also owed to the state court's consideration of the trier-of-fact's verdict.

The TCCA began its discussion of petitioner's claim by defining the offense of first degree felony murder as "the killing of another 'in the perpetration of or attempt to perpetrate any first degree murder, arson, rape, robbery, burglary, theft, kidnapping, aggravated child abuse, aggravated child neglect or airline piracy.'" *Crawford*, 2004 WL 442906, at *9 (citing to Tenn. Code Ann. § 39-13-202(a)(2) (1997)). It noted that the intent element of a first degree felony murder conviction is the intent to commit the underlying felony and that, in petitioner's case, the underlying felony was aggravated burglary. *Id*.

The TCCA then summarized the evidence that sustained the predicate felony (aggravated burglary), which included proof that Crawford was distressed and irate at Hatley for terminating their relationship and angry with her family for supporting her decision, that he bought shotgun shells and went to her father's trailer where he knew she was staying, and that he threatened Ricker and Leopold with the shotgun as they stood on the front porch attempting to bar him from entering their home. Proof was also adduced to show that, when Ricker and Leopold retreated inside the mobile home and locked the door, petitioner kicked the door and fired two shotgun blasts, with one shot going through the lock and the other striking and killing Ricker. Ricker's body blocked the front door, impeding petitioner's access through that entry point, and petitioner entered the trailer

9

through a window he had broken.  Crawford encountered Hatley and, as they battled over the gun, he threatened to kill her, Leopold, and Georgia Ricker.

The state court recognized that where the sufficiency of the evidence is challenged, the relevant question is whether any rational trier of fact, viewing the evidence in the light most favorable to the prosecution, could have found the essential elements of the crime beyond a reasonable doubt and it cited to *Jackson* for that standard.  Therefore, the decision of the TCCA was not contrary to the controlling legal rule in Supreme Court cases.

Concluding that the evidence detailed above was "overwhelmingly" sufficient to sustain Crawford's conviction for first degree felony murder in the perpetration of an aggravated burglary, the TCCA declined to give any relief.  This Court likewise must decline to grant relief, unless the state court's application of *Jackson* to the facts of petitioner's case was unreasonable or its resulting decision was based on an unreasonable factual determination.  Crawford has failed to show that the state court decision was either of these things and, hence, he cannot be granted the writ under § 2254(d).

## 2.  Fatal Defect in Indictment

Crawford next asserts that he was charged, in Count 3 of the indictment, with the commission of aggravated burglary but that missing from the indictment was the name of the individual whom petitioner allegedly intended to assault.  This omission, according to petitioner, required the jury to make a presumption as to the identity of the intended victim and thereby relieved the State of its burden to prove, beyond a reasonable doubt, the identity of the intended victim.  To illustrate his point, petitioner contrasts the method the State used to charge him in that count with the method it used to charge him with the offenses of aggravated assault in two other counts of the

indictment.  The aggravated assault counts alleged that petitioner committed an aggravated assault *and* that the respective victims were  Leopold and Hatley, which petitioner, by implication, sees as a preferred way to construct an indictment.     Crawford asserts that the absence of the identity of the victim deprived him of his constitutional right to notice and disables him from pleading a conviction in bar of future prosecutions.

When this issue was presented to the TCCA, it observed that an indictment which achieves its "overriding purpose of notice to the accused" is constitutionally sufficient and then found, citing to several state court cases, that it was unnecessary for the "aggravated burglary count of the indictment to state the intended victim of the underlying assault in order to put the defendant sufficiently on notice of the charge for which he would be required to defend himself." *Crawford*, 2004 WL 442906, at *10.  It then declined to grant relief on the claim.

Because a state court's interpretation of state law, as the Supreme Court has "repeatedly held . . . [,] binds a federal court sitting in habeas corpus," *Bradshaw v. Richey*, 546 U.S. 74, 76, 126 S.Ct. 602, 604 (2005), whether the name of a victim of an assault is an element of Tennessee's aggravated burglary offense is not a cognizable issue in a habeas corpus case.  *See, e.g., Eaglin v. Welborn*, 57 F.3d 496, 500 -501 (7th Cir. 1995) ("A state is free within extremely broad limits to decide upon the elements of a crime.").

Though there is no right to an indictment by a grand jury in a state criminal prosecution, *Watson v. Jago*, 558 F2d 330, 337 (6th Cir. 1977) (citing *Hurtado v. California*, 110 U.S. 516 (1884)), the Sixth Amendment to the United States Constitution secures to a criminal accused the fundamental right to be informed of the nature and cause of the accusations against him. U. S. Const. amend. VI.   However, "due process mandates only that the indictment provide the defendant with

'fair notice of the charges against him to permit adequate preparation of his defense.'" *Williams v. Haviland*, 467 F.3d 527, 535 (6th Cir 2006) (quoting *Koontz v. Glossa,* 731 F.2d 365, 369 (6th Cir.1984)).  And fair notice is given if "the offense [is] charged with precision and certainty so as to apprise the accused of the crime of which he stands charged.  Such definiteness and certainty are required as will enable a presumptively innocent man to prepare for trial." *Combs v. Tennessee*, 530 F.2d 695, 698 (6th Cir. 1976).

It is settled that "an indictment which fairly but imperfectly informs the accused of the offense for which he is to be tried does not give rise to a constitutional issue cognizable on habeas corpus." *Mira v. Marshall*, 806 F.2d 636, 639 (6th Cir 1986); *see also Roe v. Baker*, 316 F.3d 557, 570 (6th Cir. 2002) (citing *Mira,* 806 F.2d 639 ("The indictment here had sufficient information to provide petitioner with adequate notice and the opportunity to defend and protect himself against future prosecution for the same offense. Any other deficiencies in the indictment alleged by petitioner are solely matters of state law and so not cognizable in a federal habeas proceeding.")

The TCCA iterated the relevant legal rule of "fair notice."  Even though the TCCA did not cite to a Supreme Court case, its decision is not contrary to the clearly established rule which governs this claim.  *See Early v. Packer*, 537 U.S. 3, 8 (2002) (To satisfy the "contrary to" component of § 2254(d), a state court need not cite to or even be aware of Supreme Court precedents, "so long as neither the reasoning nor the result of the state-court decision contradicts them.").  Thus, the state court's ruling can be examined under the "unreasonable application" prong of § 2254(d), but must not be upset unless an independent review of the record and the relevant principle in Supreme Court cases persuades this Court that the ruling contravenes or unreasonably

12

applies that principle or results from an unreasonable factual determination in light of the evidence offered to the state court. *Williams v. Anderson*, 460 F.3d 789 (6th Cir. 2006).

Petitioner had notice of the facts and circumstances being alleged against him. Those facts, as contained in the indictment, were that, on June 22, 1999, Crawford knowingly entered the Ricker residence, that he entered with the intent to commit an assault, and that he acted without Ricker's effective consent. The charging instrument by and large used the statutory language and also identified the criminal statute allegedly violated. *See United States v. Resendiz-Ponce*, 549 U.S. 102, 110, 127 S. Ct. 782, 789 (2007) ( observing that it is often the case that "merely parroting the language of the statute" is sufficient to satisfy the constitutional requirement of notice). Thus the indictment served to notify petitioner of the facts involving the offense, specifically including as one of those facts that he possessed at that time the "intent to commit an assault." The omission of the identity of the victim of the intended assault does not negate the notice petitioner received. *Jones v. Cook*, 2012 WL 5467528, *7 (S.D.Ohio Nov. 9, 2012) ("Although the Count One of the indictment did not explicitly identify the name of the victim, such failure does not render the indictment constitutionally invalid.").

Furthermore, as petitioner himself alleged and as respondent suggests in his answer, Counts 4 and 5 of the indictment contained the names of the victims of the assault (albeit, those counts charged him with *aggravated* assault on those victims—a distinction without a difference as concerns the issue presented here). As the Sixth Circuit has observed, "an accused's constitutional right to notice can be satisfied by other means—not just the content of an indictment. . . ." *Stevenson v. Scutt*, 531 Fed.Appx. 576, 580 (6th Cir. July 30, 2013).

At any rate, petitioner has not cited, or even alleged, the Supreme Court precedent upon which he relies to support his argument that the TCCA's resolution of the issue was an unreasonable application of the relevant legal rule. Therefore, if there is no clearly established law regarding the particular claim raised here, then the TCCA could not have rendered a decision contrary to or an unreasonable application of a non-existent Supreme Court precedent. *See Knowles v. Mirzayance*, 556 U.S. 111, 122 (2009) ("[I]t is not an unreasonable application of clearly established Federal law for a state court to decline to apply a specific legal rule that has not been squarely established by [the Supreme] Court.") (citations and internal quotation marks omitted); *see also Wright v. Van Patten*, 552 U.S. 120, 126 (2008) ("Because our cases give no clear answer to the question presented, let alone one in [petitioner's] favor, it cannot be said that the state court unreasonabl[y] appli[ed] clearly established Federal law.") (citation and internal quotation marks omitted); *Stevenson*, 531 Fed.Appx. at 580 ("Consequently, [u]nder AEDPA, if there is *no* clearly established Federal law, as determined by the Supreme Court that supports a habeas petitioner's legal argument, the argument must fail.") (citation and internal quotation marks omitted). No relief is warranted with respect to petitioner's second ground.

### 3. Counsel Gave Ineffective Assistance by Failing to Request A Jury Instruction

In his next claim, Crawford maintains that counsel was ineffective for failing to request an instruction to the jury on voluntary intoxication to negate his culpable mental state.

The Sixth Amendment provides, in pertinent part, "[i]n all criminal prosecutions, the accused shall enjoy the right . . . to have the Assistance of Counsel for his defense." U.S. Const. amend. IV. A defendant has a Sixth Amendment right not just to counsel, but to "reasonably effective assistance" of counsel. *Strickland v. Washington*, 466 U.S. 668, 687 (1984). In *Strickland*, the

14

Supreme Court set forth a two-pronged test for evaluating claims of ineffective assistance of counsel:

> First, the defendant must show that counsel's performance was deficient. This requires showing that counsel made errors so serious that counsel was not functioning as the "counsel" guaranteed the defendant by the Sixth Amendment. Second, the defendant must show that the deficient performance prejudiced the defense. This requires showing that counsel's errors were so serious as to deprive the defendant of a fair trial, a trial whose result is reliable. Unless a defendant makes both showings, it cannot be said that the conviction . . . resulted from a break down in the adversary process that renders the result unreliable.

*Id*. As with any other claim under § 2255, the burden of proving ineffective assistance of counsel is on the movant. *Virgin Islands v. Nicholas*, 759 F.2d 1073, 1081 (3d Cir. 1985).

In considering the first prong of the test set forth in *Strickland*, the appropriate measure of attorney performance is "reasonableness under prevailing professional norms." *Strickland*, 466 U.S. at 688. A defendant asserting a claim of ineffective assistance of counsel must "identify the acts or omissions of counsel that are alleged not to have been the result of reasonable professional judgment." *Id*. at 690. The evaluation of the objective reasonableness of counsel's performance must be made "from counsel's perspective at the time of the alleged error and light of all the circumstances, and the standard of review is highly deferential." *Kimmelman v. Morrison*, 477 U.S. 365, 381 (1986). There is a strong presumption that counsel's conduct was within the wide range of reasonable professional assistance. *Strickland*, 466 U.S. at 689.

Second, a petitioner must demonstrate "a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Moss v. United States*, 323 F.3d 445, 454 (6th Cir. 2003) (quoting *Strickland,* 466 U.S. at 694). "A reasonable

15

probability is a probability sufficient to undermine confidence in the outcome." *Id*. at 454-455 (quoting *Strickland*, 466 U.S. at 694). A petitioner must demonstrate that, due to counsel's deficient performance, there was a "breakdown in the adversary process that rendered the result of the proceeding unreliable." *Id.* (quoting *Bell v. Cone*, 535 U.S. 685 (2002)). Counsel is constitutionally ineffective only if a performance below professional standards caused the defendant to lose what he "otherwise would probably have won." *United States v. Morrow*, 977 F.2d 222, 229 (6th Cir. 1992).

Respondent argues that this ineffective assistance claim has been procedurally defaulted because petitioner offered the claim to the TCCA, but not to the post-conviction court. Citing to *Martinez v. Ryan*, 132 S.Ct 1306 (2012), and *Trevino v. Thaler*, 133 S. Ct. 1911 (2013), Crawford asserts, as cause, that any procedural default is attributable to the ineffective assistance he received from his post-conviction counsel.

State prisoners must exhaust their available state court remedies before seeking federal habeas corpus relief, by presenting all claims to the state courts. 28 U.S.C. § 2254(b). If a petitioner fails fairly to present his federal claims to the state courts, and in accordance with the state's procedural rules, he forfeits the right to federal habeas corpus review of those claims, unless he can show cause for his non-compliance and actual prejudice as a result of the claimed constitutional violations, *Engle v. Isaac*, 456 U.S. 107, 129 (1982), or can demonstrate that he is actually innocent so that the failure to review his claims will result in a fundamental miscarriage of justice. *Murray v. Carrier*, 477 U.S. 478, 495-96 (1986).

However, the Court need not decide the complex procedural default issue presented here, because the claim easily fails on the merits. *See, e.g., Lambrix v. Singletary*, 520 U.S. 518, 525, 117

S.Ct. 1517, 1523 (1997) (noting that, to promote judicial economy, a court could decide to entertain an issue which is "easily resolvable" against the petitioner, where an issue of procedural default entails more complications); *Mahdi v. Bagley*, 522 F.3d 631, 635 (6th Cir. 2008) ("[F]ederal courts are not required to address a procedural-default issue before deciding against the petitioner on the merits, especially where the procedural default issue is complicated and is unnecessary to [the] disposition of the case.") (internal quotation marks and citations omitted).

As noted, the TCCA pointed out that the parties stipulated at the post-conviction hearing that the jury had received an instruction on voluntary intoxication and that the post-conviction court had included that stipulation in its findings. Because the TCCA had no record showing to the contrary, it concluded that no relief was warranted.

Here, the Warden has submitted the transcript showing discussions between the trial court and counsel concerning the jury charge, as well as the actual instructions given to Crawford's jury, [Doc. 10, Addendum 1F at 507-10, 518-61]. The transcript reveals that, at a jury-out consultation with counsel and prior to giving the instructions, the trial court invited counsel "to look at the charge of voluntary intoxication," and then explained, during the course of the discussion, that "if the culpable mental state is recklessness, then the intoxication is no defense to it as it is in any other cases," [*Id.* at 508-09]. Thereafter, following closing arguments, the jury returned from a brief break and was charged as follows:

> You have heard evidence concerning the alleged intoxication of the defendant at the time of the alleged offense.
>
> Intoxication itself is generally not a defense to prosecution for an offense. If a person voluntarily becomes intoxicated and, while in that condition, commits an act which would be a crime if he was sober, he is fully responsible for his conduct. It is the duty of persons to refrain from placing themselves in a condition which poses a danger to others.

"Intoxication" means disturbance of mental or physical capacity resulting from the introduction of any substance into the body.

"Voluntary intoxication" means intoxication caused by a substance that the person knowingly introduced into the person's body, the tendency of which to cause intoxication was known or ought to have been known.

Intoxication, whether voluntary or involuntary, is relevant to the issue of the essential element of the defendant's culpable mental state.

...

In this case, the State must prove beyond a reasonable doubt the required culpable mental state of the defendant which is "intentionally", knowingly", and "criminally negligent". . . .

If you find that the defendant was intoxicated to the extent that he could not have possessed the required culpable mental state, then he cannot be guilty of the offense charged.

If you are not satisfied beyond a reasonable doubt that the defendant possessed the culpable mental state, then you must find him not guilty. [*Id.* at 549-51].

As demonstrated above, the trial transcript shows that the trial court painstakingly instructed the jury as to the defense of voluntary intoxication. The record thus belies petitioner's claim that counsel gave ineffective assistance by failing to request a jury instruction on voluntary intoxication. Counsel did not render a prejudicial performance in this instance since counsel has no duty to ask for a jury instruction which is included in the charge, as to do so would be legally baseless, *United States v. Martin*, 45 Fed. App'x 378, 381 (6th Cir. 2002); *Krist v. Foltz*, 804 F.2d 944, 946-47 (6th Cir. 1986), and since there was no prejudice given that the jury, in fact, received an instruction on voluntary intoxication. *Greer v. Mitchell*, 264 F.3d 663, 676 (2001). This claim lacks merit.

### 4. Counsel Gave Ineffective Assistance by Failing to Develop a Mental Defense

In his next claim of ineffective assistance, Crawford alleges that counsel did not develop or present a mental health defense on his behalf, though there was evidence to demonstrate that he

18

suffered—and had suffered for his entire life—from a "tremendous" mental defect sufficient to support an affirmative defense at trial. Pointing to a psychological report authored by Dr. Eric S. Engum, which purportedly contained findings that Crawford's IQ was 70 or below, that his intellectual disabilities were such as to preclude imposition of the death penalty, that he was suicidal, and that he had a "deep" history of other mental problems, petitioner asserts that, but for counsel's failure to develop a psychological defense, there exists a reasonable probability of a different outcome.

Because the TCCA cited to *Strickland* and employed *Strickand*'s two-pronged test in reviewing petitioner's claims of ineffective assistance, its conclusions relative to those claims is not contrary to the well-established legal rule in Supreme Court cases governing these types of claims.

The claim regarding counsel's failure to mount a mental health defense was carried to the TCCA, which addressed it as follows:

> We discern from the record that the petitioner is limited intellectually; however, the petitioner failed to prove by clear and convincing evidence the viability of any mental impairment defense. He called no witnesses to establish the merits of any such defense, and we cannot speculate about whether any expert testimony would have advanced such a defense at trial. Consequently, the petitioner established no prejudice in counsel's failure to pursue a defense of mental impairment.
>
> Additionally, lead counsel, whose testimony was accredited by the post-conviction court, testified that he reviewed all of the evaluative reports and discussed a possible diminished capacity defense with the petitioner's former counsel. Based upon the record, lead counsel informed himself about the petitioner's mental limitations, articulated reasons based upon his information for not pursuing a diminished capacity defense, and made the strategic choice not to pursue such a defense. As mentioned above, we defer to tactical or strategic decisions of counsel when the choices are made after adequate preparation.

*Crawford*, 2004 WL 442906 , at *14.

As the TCCA set forth, lead counsel's accredited testimony at the post-conviction hearing showed that he delved into the issue of petitioner's mental capacities and infirmities, reviewed psychological evaluative reports on that subject, and conversed with Crawford's former counsel regarding a potential diminished capacity defense. Based upon information gleaned during his investigation of the mental health issues, as counsel stated at the post-conviction hearing, he made the decision not to pursue a mental health defense, for reasons he expressed at the hearing.

The transcript of the post-conviction hearing supports the TCCA's findings, as it reflects that counsel testified that he read a three- to four- inch stack of Crawford's medical records from the Lakeshore Mental Health Institute in Knoxville, where Crawford had been sent for thirty days to undergo a mental evaluation, and that, after reading those records and talking with Crawford's previous counsel and with petitioner himself, he concluded that there was no evidence in the record to support a mental health defense and that "there wasn't any reasonable justification for it." [Addendum 3B, Post-Conviction Hr'g Tr. at 95, 97, and 103]. During counsel's testimony, he also referred to a letter from the Middle Tennessee Mental Health Institute, which acknowledged the existence of evidence that petitioner was voluntarily intoxicated but that, in the opinion of the experts at the facility, he was not so impaired that he would not have been able to premeditate or act with intent so as to give rise to a diminished capacity defense, [*Id.* at 100, Addendum No. 3D, Letter addressed to Judge Robert E. Cupp, dated Sept. 6, 2001]. Counsel also discussed a mental health defense with Crawford, who according to counsel, was not receptive to that defense, [Addendum 3D at 103].

Counsel is assigned the duty to "make reasonable investigations." *Strickland*, 466 U.S. at 691. A strategic decision, made after a full investigation of the law and "facts relevant to plausible

options, is "virtually unchallengeable." *Id*. at 690-91.  The record, including testimony and exhibits presented at the state-court hearing, supports that counsel's decision was a strategic decision and that it was made after an adequate investigation into the facts.  It also supports the TCCA's implied finding that there was no deficient performance."  *Id.* at 699 ("Counsel's strategy choice was well within the range of professionally reasonable judgments . . . .").

Likewise, based on the lack of any expert testimony offered at the hearing to support that a viable mental health defense could have been sustained at the trial, the record supports the TCCA's conclusion that petitioner had failed to establish prejudice by showing a reasonable probability of a different outcome.  *Cullen v. Pinholster*, 131 S.Ct. 1388, 1403 (2011) ("The likelihood of a different result must be 'substantial,' not just 'conceivable.'") (quoting *Harrington v. Richter*, 131 S.Ct. 770, 791 (2011)).

Given that the AEDPA "demands that state-court decisions be given the benefit of the doubt," *Renico v. Lett*, 599 U.S. 766, 773 (2010) (citations omitted), and in view of the onerous standard which must be met to prevail on an ineffective assistance claim under the AEDPA, *see Harrington*, 131 S.Ct. at 788, the Court finds that relief is unwarranted here because the TCCA's rejection of petitioner's claim of ineffective assistance was not an unreasonable application of *Strickland* and because the state court did not unreasonably determine the facts placed before it.

**5.  Counsel Gave Ineffective Assistance by Failing to Investigate and Present the Testimony of Three Witnesses to Corroborate a Voluntary Intoxication Defense and to Interact with Co-Counsel**

Petitioner's fifth claim is asserted in his memorandum in support of his § 2254 petition, and not in his petition, [Doc. 3, Pet'r's Br. at 14].  Here, petitioner asserts that counsel failed to interact with co-counsel Janie Lindamood, who had discovered witnesses who could substantiate petitioner's

state of intoxication just prior to the killing. One supposed witness was a dump truck driver, who co-counsel located. Co-counsel testified at the post-conviction hearing that she attempted to convey this information to counsel, but was only able to engage in two brief meetings with him at a local bar, which he frequented.

When this claim was presented during the post-conviction appeal, the TCCA found that petitioner had "failed to show that he was prejudiced by lead counsel's marginalizing of associate counsel" or that he was prejudiced by counsel's failure to investigate witnesses, given petitioner's failure to call those witnesses at the evidentiary hearing. *Crawford*, 2010 WL 3561933, at *13.

When a petitioner asserts, as a deficiency on the part of counsel, that his attorney failed to interview witnesses, he must, at the very least, present the testimony or evidence that the witness would have presented at trial so that a court can conclude that he has borne his "heavy burden" of showing that, but for the absence of the testimony, there is a reasonable probability that the result of the proceeding would have been different. *Hutchison v. Bell*, 303 F.3d 720, 748 -749 (6th Cir. 2002) (noting that "a petitioner cannot show deficient performance or prejudice resulting from a failure to investigate if the petitioner does not make some showing of what evidence counsel should have pursued and how such evidence would have been material").

 Because petitioner did not offer the testimony of these supposed witnesses at the post-conviction hearing to show that the testimony would have redounded to the benefit of the defense, petitioner has failed to demonstrate that prejudice flowed from the absence of such trial testimony. The TCCA did not unreasonably apply *Strickland* when it rejected this claim, based on its conclusion that petitioner had not shown prejudice from counsel's supposed shortcoming. The writ will not issue with respect to this alleged attorney error.

With respect to counsel's failure to consult with co-counsel, the TCCA noted that the record contained evidence of lead counsel's active preparation for trial and that the post-conviction court had determined that lead counsel was entrusted with the strategic and tactical decisions at trial. A petitioner establishes prejudice by showing that "there is a reasonable probability that, but for counsel's unprofessional errors, the result of the proceedings would have been different." *Id.* at 690, 694. As noted in the previous discussion, the likelihood of a different result must be "substantial," not just "conceivable." Absent some concrete showing, on the part of petitioner, as to how the failure to consult with co-counsel prejudiced the defense, the TCCA's resolution of the issue must remain undisturbed. This claim entitles petitioner to no relief.

**6. Counsel Gave Ineffective Assistance by Failing to Obtain a Hearing Device for Petitioner Prior to Trial**

This claim and the facts underlying it were presented in petitioner's supporting brief, [Doc. 3, Pet'r's Br. at 25-26]. Petitioner alleges that he is severely hearing impaired and is considered to be deaf without the aid of proper hearing devices. His impairment was highlighted, so contends Crawford, by the post-conviction court's ordering of a continuance of the proceedings until petitioner could be supplied with a hearing device to ensure his proper participation in those proceedings. Petitioner claims that, due to counsel's failure to provide him with a hearing device, at trial, he was unable to communicate effectively with his counsel at trial, unable to hear what transpired, and unable to follow and understand the trial process in any meaningful way, which prevented him from participating in his own defense.

At the post-conviction hearing, counsel testified that, while he knew of petitioner's hearing deficiency, he had no difficulty in communicating with his client. Counsel further stated that, after arrangements to obtain hearing aids for petitioner floundered, he or his secretary bought a portable

23

amplifier that had earphones attached to it, which petitioner wore at the trial. Furthermore, according to counsel's testimony, the trial court made a thorough inquiry concerning whether the amplifier helped petitioner hear and whether he understood the trial proceedings, and that petitioner did understand and made no complaint to counsel to the contrary.

In addressing this issue during the post-conviction appeal, the TCCA reviewed the post-conviction court's findings. Among those findings were that, while no proper hearing aids were purchased for petitioner before trial, the trial court physically rearranged the parties in the courtroom to afford the petitioner proximity to the witness stand and that, once the trial began, petitioner did not complain that he could not hear. Based on these findings, the post-conviction court concluded that petitioner had shown no prejudice as a result of any deficient performance on the part of trial counsel.

The TCCA recognized that Crawford and the co-counsel had testified at the post-conviction hearing that petitioner's hearing was impaired, but further noted that no clinical evidence was offered to establish the extent of the impairment or the inefficacy of the measures employed at trial to address the issue. Absent the presentation of this kind of proof, the TCCA found that petitioner had not borne his burden of showing that counsel had given him ineffective assistance with respect to the hearing device.

As noted by the TCCA, petitioner adduced no clinical evidence to show the extent of his hearing impairment or the inadequacy of the measures taken to address his impairment at trial, and thereby failed to show prejudice flowing from counsel's alleged shortcoming. Given counsel's testimony involving petitioner's hearing impairment and the efforts made to ameliorate that hearing deficiency, which the post-conviction court accredited, and the state courts' findings, viewed

24

through AEDPA's double lens, *see Tibbetts v. Bradshaw*, 633 F.3d 436, 442 (6th Cir. 2011) (noting that habeas corpus review must utilize both the *Strickland* and § 2244(d) standards, the latter of which "sets forth a heavy burden for a petitioner to overcome"), the Court finds that TCCA did not unreasonably apply *Strickland* when it rejected this claim.

## IV.  Certificate of Appealability

Finally, the Court must decide whether to issue a certificate of appealability (COA).  A petitioner qualifies for issuance of a COA if he has made a substantial showing of the denial of a constitutional right.  *See* 28 U.S.C. § 2253(c).  A petitioner, whose claims have been rejected on the merits, satisfies the requirements of § 2253(c) by showing that jurists of reason would find the assessment of the claims debatable or wrong.  *Slack v. McDaniel*, 529 U.S. 473, 484 (2000).

The Court has individually assessed petitioner's claims under the relevant standards and finds that those claims do not deserve to proceed further because they have no viability in light of the governing law.  Thus, jurists of reason would not conclude that the disposition of those claims was debatable or wrong.  Because petitioner has failed to make a substantial showing of the denial of a constitutional right, a COA will not issue.

A separate order will follow.

**ENTER**:

s/J. RONNIE GREER
UNITED STATES DISTRICT JUDGE
